1  **WO**

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                       FOR THE DISTRICT OF ARIZONA

9

UNITED STATES OF AMERICA,          )
10                                                )
                Plaintiff/Appellee,        )
11                                                )      No. CR 08-1211-TUC-CKJ
vs.                                               )
12                                                )         **ORDER**
DANIEL MILLIS,                          )
13                                                )
                Defendant/Appellant.      )
14  _____)

15          Pending before the Court is Daniel Millis' appeal from the judgment of conviction and

16  sentence imposed by Magistrate Judge Bernardo P. Velasco.  The parties presented oral

17  argument to the Court on March 9, 2009.

18

19  *Factual and Procedural Background*

20          On February 22, 2008, United States Fish and Wildlife Service Officers Allen

21  Kirkpatrick ("Kirkpatrick") and Scott Kozma ("Kozma") were patrolling in the Buenos Aires

22  National Wildlife Refuge ("the Refuge").  The officers made contact with four individuals in

23  a Toyota 4Runner.  As Kirkpatrick approached the 4Runner, he noticed some water bottles

24  in the back of the 4Runner through the lowered back window; the back window was then

25  remotely raised.  Appellant Daniel Millis ("Millis") testified that he raised the back window

26  so the decal stating NoMoreDeaths.org would be visible; he wanted to be sure to identity

27  themselves because they have really good relations with law enforcement.  Millis, the driver

28

1   of the vehicle, indicated that they had been placing water bottles on the Refuge.[1]  Kirkpatrick

2   explained to Millis that placing water out on the Refuge was littering, that littering on a

3   national wildlife refuge was a Class B misdemeanor, and requested the individuals to pick

4   up the water jugs.[2]  While Kirkpatrick continued to talk to Millis, the passengers picked up

5   six water jugs on a north-south trail that crosses Brown Canyon Road.  Millis testified that

6   he and Kirkpatrick were "discussing the particular trail that we were parked at because he

7   thought it was a closed area and I thought that it wasn't."  7/25/08 Transcript ("RT"), p. 74.[3]

8   Millis further testified that there was "some discussion about not being able to leave out

9   water and not being allowed to pick up trash but that there are permits for both of those.

10  [Kirkpatrick] gave [Millis] the information to apply for those permits and informed [Millis]

11  that those permits would be denied."  RT, p. 76.  Christopher Fleischman ("Fleischman"),

12  one of the passengers, testified that the conversation that related to putting out water was not

13  in reference to a specific trail, but in reference to putting out water in general.  He

14  subsequently clarified on cross-examination, however, that the officers, during the first

15  encounter, were asking about water on that specific trail.  He further testified that they had

16  not been asked, at that point, if they had placed water throughout the Refuge.  He further

17  testified that it was his understanding that the focus was on the specific trail because there

18  was a discrepancy about whether that trail was closed or not.

19          The officers left and drove eastbound on Brown Canyon Road.  Kirkpatrick noticed

20  fresh tire marks on the side of the road alongside another trail and suspected the 4Runner

21  group had left water jugs in that area.  Kirkpatrick told Kozma to stop the 4Runner if it

22

23          [1]Millis and the other individuals were members of the "No More Deaths" association.

24  This association, among other activities, places water jugs in the desert for aliens/traveling
    migrants.

25

26          [2]16 U.S.C. § 668dd(f) provides for a fine under Title 18 or imprisonment of not more
    than 180 days, or both, as a penalty for an unknowing violation of the regulations.

27

28          [3]Kirkpatrick testified that the signs in the Refuge now indicate certain areas are closed
    to all public entry.

1    passed while he was down the trail looking for water jugs – Kirkpatrick told Kozma to ask

2    Millis to pick up all of the water they had placed on the Refuge that day and to again explain

3    that it was a littering crime to place water out on the Refuge.  Kirkpatrick went south on a

4    trail and found two more water jugs.

5       Meanwhile, Kozma stopped the 4Runner.  Kozma testified that Millis stated to him

6    that Millis believed water jugs had been placed on that trail and that water jugs may have

7    been placed on one other trail.  Kozma further testified that Millis stated that he was not sure

8    he could find the other trail and that it was a big trail.  Kozma further testified:

> I said, "How many water jugs are there?"  At that point he did not answer.  He just sat there thinking, I assume.  And I said, "Well, you have to pick up all the water jugs that you have placed out here.  Meet us at the next trail."  And he said, "Okay."  I said, "Not the last trail, not this big trail, meet us at the next trail specifically and we'll start looking for these."

12    RT, p. 49.  Millis testified that he informed Kozma that they had left a lot of water out that

13    day.  He further testified:

> He said, "Well, can you get it?"  I said, "That would be very difficult.  That would be pretty tough for us to do."  There was some discussion about picking up some of the other water.  I volunteered a trail that I knew was very easy to locate and where the water would be easy for us to recover and offered to go recover that water.  He instructed us to do that.

17    RT, p. 79.  Millis testified that they went to the discussed trail, picked up the water, and

18    waited for the officers.  Fleischman testified:

> To the best of my recollection, he asked if we could stop at a place where we could easily find more water.  I do not recall him saying go to the next place where you could find water.  I think I would remember that.  Because as far as I recall, along the way we were doing everything that they asked us to do.  So I don't remember him saying go to the next trail where you can easily find water.

22    RT, p. 96.

23       The officers again drove eastbound on Brown Canyon Road.  They noticed fresh

24    tracks along side another trail, stopped, and recovered three more water jugs.  They drove

25    further eastbound, noticed more fresh tracks, and found four more water jugs.  The drove

26    eastbound again, noticed more fresh tracks by a trail, but did not stop.

27       The officers stopped by the 4Runner and its occupants further east on Brown Canyon

28    Road.  Millis and the three passengers were standing outside the 4Runner.  Kirkpatrick

1   testified that he believed that they "had not stopped to recover any water at all" and that

2   "they were not going to comply with picking up all of the jugs." RT, p. 36. Millis testified

3   that they picked up four water jugs at this location.

4        Kirkpatrick testified that when he initially asked Millis for his driver's license, Millis

5   refused. Kirkpatrick then testified that the 4Runner occupants asked if they could take

6   pictures and contact their attorney, to which Kirkpatrick told them they could. Millis

7   testified that he had been on the phone trying to reach his lawyer and he did not recall

8   delaying "too much in showing [Kirkpatrick his] identification." RT, p, 82. Kirkpatrick

9   testified that, after he told Millis that he would be cited if he did not provide his driver's

10  license, Millis provided his driver's licence. Kirkpatrick wrote a citation for littering and

11  asked Millis to sign the citation; Millis initially refused. Kirkpatrick stated that Millis

12  indicated that he would take full responsibility and requested that the passengers not be cited.

13  Kirkpatrick only cited Millis; Millis signed the citation.

14        Millis testified that, after he signed the citation, Kirkpatrick asked him, for the first

15  time, where the water bottles had been placed. Millis informed him where he believed the

16  remaining bottles were. Kirkpatrick testified that Millis showed him a notebook, including

17  Exhibit 16, that provided details regarding the No More Deaths water drop route. Millis

18  further testified that, if they had been asked to go back and pick up all of the water bottles

19  that they had placed there, they would have done so.

20        At trial, Kirkpatrick created a map, including the trails marked one through six from

21  east to west on Brown Canyon Road. The map also included numbers which reflected the

22  numbers used by the organization No More Deaths to identify trails and water drop routes.

23  *See* Ex. 28. The numbers also corresponded to numbers written on the water jugs along with

24  the date of 2/22/08.

25        Kirkpatrick also testified that the Refuge has been listed as one of the ten more

26  imperiled or endangered national refuges in the country because of trash problems. Evidence

27  was presented to show the litter, including thousands of water bottles and backpacks, articles

28  of clothing, foodstuffs, and vehicles, left in the Refuge. The Refuge is the last remaining

habitat in the United States for the masked bobwhite quail and home to many endangered plant, bird, and animal species. Nonetheless, refuge managers have given a permit to Humane Borders to place water tanks on the Refuge. *See* Ex. 24 and 25. Kirkpatrick testified that one of these tanks was less than a mile to two miles from where the 4Runner occupants had left water jugs.

Millis' citation for Littering on a National Wildlife Refuge, First Offense, in violation of 50 C.F.R. § 27.94, proceeded to trial on July 25, 2008. The magistrate judge took the matter under advisement. On September 22, 2008, Magistrate Judge Velasco found Millis guilty of littering in a national wildlife refuge and suspended the imposition of sentence.

*Jurisdiction*

This Court has appellate jurisdiction of the magistrate judge's entry of the judgment of conviction and sentence. *See*, 18 U.S.C. § 3402 ("In all cases of conviction by a United States magistrate an appeal of right shall lie from the judgment of the magistrate to a judge of the district court of the district in which the offense was committed"); Fed.R.Crim.P. 58(g).

*Standard of Review*

"The scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58(g)(2)(D). A district court reviews a magistrate's factual findings for clear error and its legal conclusions de novo. *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir.1986). Mixed questions of fact and law are subject to de novo review, however the factual findings that underlie the application of the law are reviewed for clear error. *Id.; United States v. Prieto-Villa*, 910 F.2d 601, 604 (9th Cir.1990). Additionally, a "reviewing court must respect the exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir.1996).

1   *Sealed Bottles of Pure Water as Litter*

2          Millis asserts that the leaving of full jugs of life-sustaining water for human

3   consumption does not constitute littering.  The regulation prohibiting the disposal of waste

4   states:

5          The littering, disposing, or dumping in any manner of garbage, refuse, sewage,
       sludge, earth, rocks, or other debris on any national wildlife refuge except at points
6      or locations designated by the refuge manager, or the draining of dumping of oil,
       acids, pesticide wastes, poisons, or any other types of chemical wastes in, or otherwise
7      polluting any waters, water holes, streams or other areas within any national wildlife
       refuse is prohibited.

8
9   50 C.F.R. § 27.94(a).  Millis argues that this case is similar to *Schneider v. State of New*

10  *Jersey (Town of Irvington)*, 308 U.S. 147, 60 S.Ct. 146 (1939), in which the Court

11  determined that the dissemination of leaflets to others, who might commit the crime of

12  littering, was not, in itself, littering.  Millis asserts that the regulation must be narrowly

13  tailored and that the regulation does not cover the dissemination of pure water in sealed jugs

14  for consumption by humans.  Indeed, the rule of lenity requires an ambiguous criminal law

15  to be interpreted in favor of a defendant accused of violating the law and "fundamental

16  principles of due process [. . .] mandate that no individual be forced to speculate, at peril of

17  indictment, whether his conduct is prohibited."  *United States v. Nader*, 542 F.3d 713, 721

18  (9th Cir. 2008); *see also United States v. Melendrez*, 389 F.3d 829 (9th Cir. 2004) (under rule

19  of lenity, ambiguities are construed in defendant's favor only if statute is truly ambiguous);

20  *United States v. Ramirez*, 347 F.3d 792, 802 (9th Cir. 2003) ("The rule of lenity favors . . .

21  a narrow construction.  We 'will not interpret a federal criminal statute so as to increase the

22  penalty that it places on an individual when such an interpretation can be based on no more

23  than a guess as to what Congress intended.'").

24          The government asserts, however, that Millis was not distributing the water jugs to

25  other persons . . . who then might dispose of them.  He placed them on the ground and left

26  them for when, and if, a traveler might pass by.  Furthermore, the government argues that the

27  decision in *Schneider* is based on a First Amendment analysis as the leaflets were considered

28  speech.

In this case, there is no First Amendment implication in the leaving of water jugs in the desert.  In analyzing the regulation, the Court starts with the language of the regulation. *United States v. Banks*, 514 F.3d 959 (9th Cir. 2008).  However, the Court must also look to the context and purposes of the regulation.  *See United States v. Hughes*, 292 F.3d 1228, 1231 (9th Cir. 2002) (looking to context and purpose of provision in addition to plain text).

Congress has provided that the Secretary of the Interior may issue regulations to carry out the purposes of statutes covering the National Conservation Recreational Areas.  *See* 16 U.S.C. 460k-3.  Congress has designated the National Wildlife Refuge System ("the System") to be administered by the Secretary.  16 U.S.C. § 668dd(a)(1).  Congress stated that the mission of the System is to "administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."  16 U.S.C. § 668dd(a)(2).  In administering the System, the Secretary is to, *inter alia*, "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans[,]" 16 U.S.C. § 668dd(a)(4)(B), to "plan and direct the continued growth of the System in a manner that is best designed to accomplish the mission of the System, to contribute to the conservation of the ecosystems of the United States," 16 U.S.C. § 668dd(a)(4)(C), ensure the mission and purposes of the System are carried out, 16 U.S.C. § 668dd(a)(4)(D), and to permit wildlife-dependent public/recreational use when it is not inconsistent with public safety.  16 U.S.C. §§ 668dd(a)(4)(H)-(K) and 668dd(d)(3)(A)(iii). Additionally, Congress has provided that no person shall disturb or injure any property, including natural growth, in the System or:

> enter, use, or otherwise occupy any such area for any purpose; unless such activities are performed by persons authorized to manage such area, or unless such activities are permitted either under subsection (d) of this section or by express provision of the law, proclamation, Executive order, or public land order establishing the area, or amendment thereof[.]

1   16 U.S.C. § 668dd(c).  The Secretary is authorized to permit uses of any area within the

2   System when it is determined "that such uses are compatible with the major purposes for

3   which such areas were established[.]" 16 U.S.C. § 668dd(d)(1)(A).

4          Congress has also provided:

5          In administering such areas, the Secretary is authorized to manage timber, range, and
           agricultural crops; to manage other species of animals, including but not limited to
6          fenced range animals, with objectives of perpetuating, distributing, and utilizing the
           resources; and to enter into agreements with public and private agencies.
7
8   16 U.S.C. § 715i(b).  Congress has additionally provided that areas made available to the

    Secretary of Interior:
9
10         shall be administered by him directly or in accordance with cooperative agreements
           entered into pursuant to the provisions of section 661 of this title and in accordance
11         with such rules and regulations for the conservation, maintenance, and management
           of wildlife, resources, thereof, and its habitat thereof, as may be adopted by the
           Secretary . . .
12
13  16 U.S.C. § 664.  Congress has also determined that, while "public demands for recreational

14  opportunities on areas within the National Wildlife Refuge System" need to be recognized,

    the Secretary is authorized:
15
16         to administer such areas or parts thereof for public recreation when in his judgment
           public recreation can be an appropriate incidental or secondary use: *Provided*, That
17         such public recreation use shall be permitted only to the extent that is practicable and
           not inconsistent with other previously authorized Federal operations or with the
18         primary objectives for which each particular area is establish: *Provided further*, That
           in order to insure accomplishment of such primary objectives, the Secretary, after
19         consideration of all authorized uses, purposes, and other pertinent factors relating to
           individual areas, shall curtail public recreation use generally or certain types of public
20         recreation use within individual areas or in portions thereof whenever he considers
           such action to be necessary[.]
21  16 U.S.C. § 460k.

22         Considering the plain language of the regulation, in light of the purposes of the

23  System, as made clear by Congress, the regulation is intended to prevent the disposal of

24  unauthorized items in the System.  Millis' argument that his conviction cannot stand because

25  the water jugs were of value and would have provided life-sustaining water for human

26  consumption fails to recognize that if every person was permitted to subjectively determine

27  if something placed on the ground is of value, no discarded item could be the basis of a

28  littering conviction.  Millis appears to place particular importance on the fact the item left

1   behind was life-sustaining water.  Under Millis' argument, then, bottles of insulin, packaged

2   food, and jackets in cold seasons could never be the basis of a littering conviction.  While

3   each of these items may sustain life if discovered by a person needing such item, it does not

4   change the fact that, when left in a refuge and not given to any person, the items, at the time

5   of the disposal, have no value to anyone.  While "'one man's trash is another man's

6   treasure[,]'" *Exhols v. C.I.R.*, 935 F.2d 703 (5th Cir. 1991), *citations omitted*, there is no

7   indication in either the regulation or relevant statutes that "value" should be considered in

8   determining whether an item is garbage.  Moreover, 50 C.F.R. § 27.94(a) is not truly

9   ambiguous in that it does not permit littering, disposing, or dumping in any manner of

10  garbage or debris in any national wildlife refuge.  It is only if the Court accepts Millis'

11  premise that subjective value may be placed on the item to avoid the item being classified

12  as garbage that the regulation becomes truly ambiguous.[4]

13      During oral argument, the government, in response to a question from the Court,

14  asserted that everything left in a refuge would be considered refuse under the regulation.

15  Millis argues that, if that was the intent of the Secretary in promulgating the regulation, the

16  Secretary would not have specified "garbage, refuse, sewage, sludge, earth, rocks, or other

17  debris" in the regulation.  50 C.F.R. § 27.94(a).  However, it is not simply the items being

18  disposed of that constitutes a violation of the regulation, but the "littering, disposing, or

19  dumping in any manner" of the specified items that constitutes a violation.  *Id.*  Leaving a

20  plastic container, no matter what it may be filled with, in the Refuge cannot be said to benefit

21

22

23

---

24      [4]Implicit in Millis' assertion is a consideration of the geographical location of the
25  placement of the water jugs (i.e., their value is increased because they were placed in the
    Arizona desert as opposed to on a snow-covered trail in the Rocky Mountains).  However,
26  if the Court were to accept Millis' assertion that value should be considered, not only would
    consideration of the Arizona desert be appropriate, but consideration of the geographical
27  proximity of the water tanks and the emergency beacon would also be appropriate, thereby
28  lessening the value of the water jugs.

1   the Refuge.[5]  Had Millis kept the plastic containers, they may not have been garbage . . . but

2   by leaving (i.e., littering or disposing of) the items in the Refuge, with a possibility that a

3   traveling migrant, Deaths No More participant, or some other person might later retrieve the

4   containers does not alter the fact that, at the time the containers were left in the Refuge, they

5   were refuse or garbage.  "[A]n unforced, natural reading of the plain text provides no support

6   for the interpretation [Millis] proposes."  *Banks*, 514 F.3d at 966.

7        The Court finds the regulation is not *truly ambiguous* because littering/disposing and

8   garbage/debris have meaning as it is normally spoken.  *See Bodine v. Graco, Inc.*, 533 F.3d

9   1145 (9th Cir. 2008).  Unauthorized items left in a wildlife refuge constitute garbage.  The

10  Court finds the water jugs, left in the refuge, constitute "garbage, refuse, sewage, sludge,

11  earth, rocks, or other debris."  50 C.F.R. § 27.94.

12

13  *Alleged Implied Promise Not to Prosecute*

14        Millis argues that the evidence was uncontradicted that the officers promised not to

15  charge Millis upon his promise to pick up the water jugs.  The government argues, however,

16  that while the officers were not intending to write citations if the water jugs were retrieved,

17  that intent does not constitute a promise.  Moreover, the government argues that Millis did

18  not retrieve the water jugs after being given two opportunities to do so.  The Court

19  recognizes that it was the "exclusive province of the fact finder to determine the credibility

20  of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven

21  facts." *Hubbard*, 96 F.3d at 1226; *see also United States v. Stanton*, 501 F.3d 1093 (9th Cir.

22  2007).  Indeed, this Court is to assume "'that the [trier of fact] resolved all such matters in

23

24

25        [5]Indeed, even the Deaths No More organization recognizes that the plastic jugs

26  constitute refuse.  *See* Response, Ex. 16 (directing people leaving water to bring "a trash bag

27  to clean up prior water drop refuse").  Millis' argument that, when filled with pure water,

28  they are not garbage requires an acceptance of Millis' subjective placement of value on the

    pure water.

a manner which supports the verdict.'" *United States v. Kranovich*, 401 F.3d 1107, 1113 (9th Cir. 2005).

Assuming the trier of fact resolved all credibility issues in a manner which supports the verdict, the magistrate judge, therefore, determined that any conflict between the officers' testimony and Millis' testimony was resolved in the officers' favor.[6]  In other words, the testimony of the officers' established that Kozma specifically informed Millis that he had "to pick up all the water jugs that [Millis' group] have placed [in the Refuge]" and that Millis and his group should meet the officers at the next trail.  RT, p. 49.  Assuming the trier of fact resolved all disputes in favor of supporting the verdict, Millis was directed to retrieve all of the water bottles and meet with the officers at the next trail.  Millis did not comply with the directives of the officers.

Millis argues, however, that he made a good faith attempt to pick up the water jugs as directed by the officers because of the implied promise not to prosecute.  Indeed, where government officials have misled an individual into believing that his conduct was not prohibited, the government's behavior is "an indefensible sort of entrapment" such that the Due Process Clause does not permit a conviction.  *Cox v. Louisiana*, 379 U.S. 559, 571, 85 S.Ct. 476, 13 L.Ed. 487 (1965), *citing Raley v. Ohio*, 360 U.S. 423, 426, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959).[7]

The Ninth Circuit has stated:

> When a defendant claims, as does appellant here, that his criminal conduct was the result of reliance on misleading information furnished by the government, society's interest in the uniform enforcement of law requires at the very least that he be able to show that his reliance on the misleading information was reasonable – in the sense that a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.

---

[6]The Court notes that the trier of fact had indicated that he did not view the case as a credibility of witness case.  RT, p. 102.  However, the magistrate judge made this comment prior to counsel arguing that the government may be estopped from charging an offense.

[7]The Court notes that Millis cited to *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed. 471 (1965).  While this was a related case, it did not address the reversal of a conviction based on the reliance of statements by government officials.

1   *United States v. Lansing*, 424 F.2d 225, 227 (9th Cir. 1970).  Even accepting the facts as

2   testified to by Millis (i.e., "Kirkpatrick made it pretty clear when you are in a wildlife refuge

3   you can't leave the water bottles[.]" RT, p. 86), the officers never informed Millis that his

4   conduct was not prohibited.  *See also United States v. Brebner*, 951 F.2d 1017 (9th Cir.

5   1991).  Moreover, a person sincerely desirous of obeying the law would have returned to

6   each location where water jugs had been left and retrieved the water jugs.

7           In *Cox*, the defendant had been informed that he could demonstrate at a specified

8   location.  Indeed, the officer had implied that demonstrating at a different location would be

9   legal. The Supreme Court found that his subsequent arrest for conduct that he had received

10  permission for violated due process.  The case at bar is different because Millis has not

11  asserted that he was told that it was legal to leave water jugs in some locations; rather, the

12  officers made it clear that the water bottles could not be left behind.  *See also Raley* (where

13  persons were informed a privilege against self-incrimination existed, they could not

14  subsequently be charged with refusing to answer questions).  Even accepting Millis' account

15  of the encounters, Millis has not shown that his conviction is barred by the Due Process

16  Clause or that he is entitled to a reversal based on an entrapment by estoppel defense.

17          Accordingly, IT IS ORDERED the judgment and imposition of a suspended sentence

18  are AFFIRMED.

19          IT IS FURTHER ORDERED the Clerk of the Court shall close its file in this matter.

20          DATED this 19th day of March, 2009.

21

22

23   _____
                Cindy K. Jorgenson
24           United States District Judge

25

26

27

28